**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LIDIA VETTER and GREGORY NOBLE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 06-cv-3528 |
| | ) | |
| JEREMY DOZIER, DAVID | ) | Judge Robert M. Dow, Jr. |
| CHARNICKY, LANCE POWELL, and | ) | |
| ROBERT MEEDER, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' motion for summary judgment [93]. For the reasons set forth below, that motion is granted in part and denied in part. The motion is granted as to the claims against Defendants Meeder and Powell, and the motion is denied as to the claim against Defendant Charnicky. Viewing the record in the light most favorable to Plaintiffs, a jury could conclude that Defendant Charnicky was deliberately indifferent to a substantial risk of serious harm, and that the deliberate indifference caused Plaintiffs' alleged constitutional deprivation. The Court agrees, however, that causation is too attenuated with respect to Defendants Meeder and Powell, even when viewed in the light most favorable to Plaintiffs.

**I.      Procedural Background**

Plaintiffs, Lidia Vetter ("Vetter") and Gregory Noble ("Noble") filed this lawsuit in June 2006. Initially, their complaint named the State of Illinois and the Illinois State Police as defendants. Judge Lefkow ordered the dismissal of claims with respect to both on sovereign immunity grounds [see 14]. Plaintiffs' second amended complaint [39] names as defendants Lieutenant David Charnicky ("Charnicky"), Sergeant Lance Powell ("Powell"), and Sergeant

Robert Meeder ("Meeder") (collectively "Defendants"). The complaint also names Jeremy Dozier—the officer who allegedly committed the underlying constitutional violation in Count I of the complaint—but Dozier has defaulted [50], he is not part of the summary judgment motion before the Court, and any prove-up will be deferred (until trial) [*id.*].

Plaintiffs claim in Count II of their complaint that Defendants had knowledge of Dozier's "repeated and continual abuse of police power for years prior to" Plaintiffs' injury. Compl. ¶ 13. What is more, Dozier's conduct increased in severity over time (*id.* ¶ 14), and the supervisors condoned and ignored the conduct (*id.* ¶ 21). Defendants' answer denies the principal allegations against them and asserts qualified immunity as a shield against suit.

The case was reassigned to this Court [77]. After completing discovery, Defendants filed their motion for summary judgment [93]. The Court has federal-question subject-matter jurisdiction over the action based on 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

## II.    Facts

The Court takes the relevant facts primarily from the parties' respective Local Rule ("L.R.") 56.1 statements: Defendant's Statement of Facts ("Def. SOF") [95], Plaintiff's Response to Defendant's Statement of Facts ("Pl. Resp. Def. SOF") [104], Plaintiff's Statement of Additional Facts ("Pl. SOAF") [109], and Defendant's Response to Plaintiff's Statement of Additional Facts ("Pl. Resp. Def. SOAF") [117].[1]

---

[1] L.R. 56.1 requires that statements of fact contain allegations of material fact, and that the factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g.*, *Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider the statement. See, *e.g.*, *Malec*, 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. See L.R. 56.1(a), (b)(3)(B); see also *Malec*, 191 F.R.D. at 584.

### A. Vetter, Gregory, Dozier, and the Eponymous Encounter

Lidia Vetter is a 19 year-old high school graduate. At the time of the incident with Officer Jeremy Dozier in April 2005 (the "Dozier Encounter"), she was 17 years old. Gregory Noble is a 23 year-old high school graduate. At the time of the Dozier Encounter, he was 21 years old. Pl. SOAF ¶¶ 1-2.

Jeremy Dozier ("Dozier") joined the Illinois State Police in 1996. Def. SOF ¶ 34. In 1998, and twice in 1999, he was recognized as being one of the "Top 15" troopers in his district for his exceptional contributions to the goals and objectives of the district. Def. SOF ¶ 35. Dozier also was assigned to security details that assisted federal authorities in providing motorcades for VIPs in the Chicago area. Defendant Charnicky testified that he would never have assigned Dozier to these details had he been concerned about Dozier's behavior. Def. SOF ¶ 38.

Indeed, throughout his tenure Dozier received numerous letters of appreciation, including notes from citizens, other state agencies, and the Illinois State Police. Def. SOF ¶ 36. Dozier also received numerous positive personal counseling memoranda from supervisors other than Defendants; the memoranda commended his leadership, dedication, and organizational pride, as well as complimenting him on preserving public safety and using good judgment. Def. SOF ¶ 37. Plaintiff notes, however, that at least one of the memoranda flagged by Defendants was signed-off on by Charnicky. See Def. SOF, Ex. X ("Dozier ISP Personnel File"), at #00073.

---

The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts. See, *e.g.*, *Malec*, 191 F.R.D. at 584 (citing *Midwest Imports*, 71 F.3d at 1317). Similarly, the Court disregards a denial that, although supported by admissible record evidence, does more than negate its opponent's fact statement—that is, it is improper for a party to smuggle new facts into its response to a party's 56.1 statements of fact. See, *e.g.*, *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008).

Moreover, and as discussed more fully below (see *infra* Part II.C), Plaintiffs point to other, less praiseworthy aspects of Dozier's tenure with the Illinois State Police.

As to the Dozier Encounter itself, the details are not much in dispute. On April 29, 2005, Plaintiffs were situated in a vehicle in a parking lot in Gurnee, Illinois. They were engaged in amorous activity and had removed some of their clothing. Def. SOF ¶ 39; Pl. SOAF ¶ 3; Vetter Dep. at 21-22. Dozier approached Plaintiffs by shining a flashlight in their car and then (falsely) identified himself as a Gurnee Police Officer. Pl. SOAF ¶ 3; Def. SOF ¶¶ 40-51. Dozier stated that there had been a complaint lodged against Plaintiffs by people living in neighboring buildings. Pl. SOAF ¶ 4. Dozier told Plaintiffs that instead of arresting them and telling their parents, he would let them come up with an alternative punishment that would "fit the crime."[2] Pl. SOAF ¶ 5; Noble Dep. at 43. Dozier suggested that Plaintiffs go to a nearby construction site and run in a circle around some construction machinery while naked, and Plaintiffs complied. Def. SOF ¶ 44. The incident left both Vetter and Noble traumatized. Pl. SOAF ¶ 8. They reported the incident to the Gurnee Police Department. Def. SOF ¶ 45. A few months after the incident, Plaintiffs identified Dozier's photograph from a photographic line-up. Def. SOF ¶ 46. Dozier eventually was arrested and is no longer with the Illinois State Police. See Def. SOF ¶¶ 3, 103.

Plaintiffs concede that none of the defendants was aware of the Dozier Encounter until Dozier was arrested for a different incident in June 2005. Def. SOF ¶ 49.

---

[2] Defendants' deny that Dozier referred to alternative "punishments," but the cited Deposition (Vetter's) states that Dozier "said if we did something that fit the crime, then we wouldn't get our parents told and wouldn't get arrested." Vetter Dep. at 32. Therefore, the denial is disregarded—a jury could reasonably infer, given the well-worn phrase, that the "something" that fitted the crime was, in fact, a punishment. Moreover, the Court notes that Noble's deposition testimony states that Dozier told Plaintiffs: "You don't want to go to jail. Come up with a punishment." Noble Dep. at 43.

**B.     The Defendant Supervisors and their Duties within the Illinois State Police**

Robert Meeder holds the rank of Master Sergeant and was Dozier's immediate supervisor for approximately five months, from January 1, 2005, through June 17, 2005.  Def. SOF ¶ 4.  Lance Powell, too, holds the rank of Master Sergeant and was Dozier's immediate supervisor from January 2002 through January of 2005.  Def. SOF ¶ 5.  David Charnicky is a now-retired Illinois State Police Lieutenant.  Charnicky was Dozier's second-level supervisor from April 2000 through June 17, 2005.  Def. SOF ¶ 6.

Within the Illinois State Police ("ISP"), both lieutenants and master sergeants have supervisory responsibilities.  According to the Illinois State Police Rules of Conduct, "Supervisory personnel are responsible for subordinates' adherence to Department rules, regulations, policy, orders, directives and procedures and will take reasonable action to ensure compliance."  Pl. SOAF, Ex. D ("Rules of Conduct"), at III.B.  Supervisors are responsible for the job performance of their subordinates.  *Id.*

Master sergeants are responsible for "supervising, evaluating, training, scheduling, and counseling of subordinates."  Pl. SOAF, Ex. E ("Master Sgt. Job Description"), at 2.  Among the "principal accountabilities" of a master sergeant are to serve as the first step in the RC-164 grievance process,[3] to initiate and conduct "corrective actions such as oral and written counseling," and to participate "in providing input into the overall disciplinary process."  *Id.* at 3.  A lieutenant, "under general direction, through subordinate supervisors, performs highly responsible supervisory, administrative, and management functions."  Def. SOF, Ex. F ("Lt. Job Description"), at 1.  Lieutenants directly supervise master sergeants.  *Id.*  Lieutenants are "responsible for the supervision, evaluation, and counseling of immediate subordinates; may

---

[3] The details of that process are not discussed by the parties.

conduct summary punishment concerning disciplinary action; and provide[] related information to higher levels in resolution of disciplinary matters." *Id.* at 2.

The parties have spilled considerable ink in describing the precise limits of Defendants' authority as supervisors. Plaintiffs have an expansive view, Defendants a narrow one. For example, Plaintiffs point to record evidence that Lieutenant Charnicky could have imposed some degree of summary punishment on Officer Dozier for the incidents that are documented below. See, *e.g.*, Pl. SOAF ¶ 11; Lt. Job Description at 1; see also Def. Resp. Pl. SOAF, Ex. B. Supp. ("Meeder Dep. Supp."), at 178 (master sergeants have authority to request that an officer be placed on desk duty). Defendants, on the other hand, point to evidence that there were few steps that Charnicky could have taken in terms of corrective action. See, *e.g.*, Def. Resp. Pl. SOAF ¶ 11; Def. SOF, Ex. N ("Snyders Dep."), at 69 (discussing departmental practices and characterizing as "vague" some of the language related to the lieutenant job description).

The parties' dispute, however, does not bear on the resolution of Defendants' summary judgment motion. If it did, then the Court would be required to view the evidence in the light most favorable to Plaintiffs at this stage of the litigation. More important, and although the deliberate indifference framework includes a safe-harbor of sorts for supervisors who respond reasonably to the information that they receive (see *infra* Part V), Plaintiffs have presented record evidence that two Defendants were complicit in covering up Dozier's earlier misconduct. That evidence is discussed immediately below in Part III.C. The *limits* of Defendants' supervisory authority, therefore, are not implicated by Defendants' motion for summary judgment: the fight about what steps Defendants could have taken is orthogonal to the record evidence about what steps Defendants actually took. Plaintiffs' theory is not that the supervisors turned a cold shoulder to complaints about Officer Dozier; it is that they actively elbowed such

complaints out of the way. And, according to the Illinois State Police Directive on Complaint and Disciplinary Investigations, all Illinois State Police employees have the duty to report misconduct and supervisors must "record all information available at the time the complaint was received, prepare a written report, and forward" the report up the chain of command. Pl. SOAF, Ex. B ("ISP Directive PER-030"), at 2.

## C. Dozier's Prior Misconduct

Plaintiffs point to incidents of Officer Dozier's misconduct that occurred prior to Plaintiffs' encounter with Dozier in April 2005. Where Plaintiffs have presented evidence that Defendants knew of the misconduct, the incidents are discussed below. Because the deliberate indifference framework is not concerned with what Defendants should have known (*Farmer v. Brennan*, 511 U.S. 824, 838 (1994)), other incidents generally have been omitted from considered discussion.[4]

As detailed below, there is record evidence that Defendant Meeder had knowledge of two prior incidents of misconduct or arguable misconduct, although he was a supervisor only with respect to one of the incidents. As to the earlier of the two incidents (before he was Dozier's supervisor), the only record evidence indicates that Meeder reported the complaint to his superior officer and told the aggrieved party how to file an official complaint. Defendant Powell had knowledge of three prior incidents of misconduct or arguable misconduct, although he was a supervisor during just two of the incidents. Defendant Charnicky had knowledge of three incidents of misconduct or arguable misconduct. With respect to all three instances, there is

---

[4] The excluded incidents are: Dozier's alleged sexual harassment of co-workers at his secondary employment with Zion Park District (see Pl. SOAF, Ex. II), allegations that Dozier and other troopers spied on women from a hotel parking lot (see Pl. Resp. Def. SOF ¶ 119); the "Baum and Boyko Incident" (see Def. SOF ¶ 98); and the **"Poby Incident"** (see Def. SOF ¶ 106).

evidence that he either looked the other way or took steps to thwart the subsequent investigations.

### 1. Motorist Search Complaint

Sometime between 1996 and 1998, before Meeder became Dozier's supervisor, Meeder backed up Dozier on a traffic stop. When Meeder arrived at the scene, the female motorist who had been stopped approached Meeder to complain about the search technique used by Dozier. The motorist complained that Dozier had put his thumbs underneath her bra. Meeder testified at his deposition that he reported the complaint to his supervisor at the time, Master Sergeant Pete Howe. Def. SOF ¶¶ 50-51; Def. SOF, Ex. B ("Meeder Dep."), at 127-28. Meeder also testified that he gave Master Sergeant Howe's contact information to the motorist.

Plaintiffs have not submitted with their Statement of Additional Facts [109] any of their own fact statements regarding the incident. In denying Defendants' fact statement that Meeder reported the incident, Plaintiffs argue that if Meeder had reported the information to Howe, then a file would have been created and sent to the Division of Internal Investigation ("DII"). Yet, Plaintiffs also state that on certain occasions DII files were not created by supervisors when they should have been. See, *e.g.*, Pl. SOAF ¶ 37. Indeed, that is part of the theory of their case. More important for summary judgment purposes, however, is the lack of record evidence for the proposition that there is no investigatory paper trail. While the lack of a business record may have evidentiary value (see Fed. R. Evid. 803(7); *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven* Cents, 307 F.3d 137,147-48 (3d Cir. 2002)), Plaintiffs have not drawn to the Court's attention any requests for documentation that went unfulfilled; they merely cite the policy documents indicating that a DII file should have been created. In sum, the only evidence that was submitted to the Court regarding the motorist search

complaint came from Defendants, and it consists of Meeder's deposition testimony which states that he reported the complaint to his superior officer.

None of the Defendants was a supervisor of Dozier at the time of the motorist search complaint.  Def. SOF ¶ 52.

### 2.     Alleged Spying on Terry Faro

Plaintiffs have not furnished the Court with admissible record evidence indicating that any of the defendants knew about allegations that Dozier spied on Terry Faro.

Plaintiffs state that in 1999 Dozier spied on a friend's wife, Terry Faro, who was suspected of having an affair.  Pl. SOAF ¶ 12.  Plaintiffs further state that Powell knew of the spying allegations.  Pl. SOAF ¶ 13.  Plaintiffs also represent that Dozier has admitted to spying on Terry Faro, but Plaintiffs omitted the pertinent deposition pages from their fact statement exhibits.  See Pl. SOAF, Ex. X ("Dozier Dep.") (pp. 174-75 omitted).  Defendants' response to Plaintiffs' fact statements includes the omitted pages; those pages do not jibe with Plaintiffs' fact statement.

Dozier admitted that he was warned not to use his computer to run the plates of Terry Faro's boyfriend and give the information to Terry Faro's husband (Michael Faro).  Pl. Resp. Def. SOF, Ex. W Supp. ("Dozier Dep. Supp."), at 162, 175.  Dozier's recollection was that the complaint was lodged by Faro's boyfriend rather than Terry Faro and that the warning came from Master Sergeant Howe, who appears to have been Dozier's direct supervisor at that time. *Id.* at 162-63.

And although Plaintiffs state that Powell knew about the allegations (Pl. SOAF ¶ 13), they do not cite supportive record evidence.  Plaintiffs' fact statement cites first to Dozier's deposition testimony, which (again) states only that Dozier received a warning from Master

Sergeant Howe.  Plaintiffs also cite an "investigative summary" from 2005 of an interview with *Michael* Faro, after Dozier was arrested.  The summary states:

> On July 13, 2005, DII agents interviewed [Michael] Faro, who works for the Illinois State Toll Highway Authority (ISHTA).  Faro acknowledged he asked Trooper Dozier to go to a Waukegan residence in 1999 to find his wife because he suspected his wife was having an affair.  Faro knew his wife contacted District 15 to complain about Trooper Dozier.

Pl. SOAF, Ex. U ("Group Investigatory File"), at Bates # 00800.

Thus, Plaintiffs' fact statement does not link Powell to any complaint by Faro.  The statement mentions only that District 15 was notified.  Although Plaintiffs do not cite it, another document in the DII file provides better support for Plaintiffs' proposition.  That document is captioned "Illinois State Police Investigatory Report."  Group Investigatory File, at Bates # 2049.  The document, dated July 22, 2005, recounts an interview that investigators had with Michael Faro.  In that interview, Faro states that he "knew" that Terry Faro complained to District 15 and that he "believed" his ex-wife spoke with Powell.

The problem for Plaintiffs is that the statement does not represent admissible record evidence.  First, it is rank hearsay.  Although for summary judgment purposes, exhibits need only represent admissible testimony, these statements would be hearsay if elicited at trial because it is double-hearsay with only a fifty-percent cure:  the police report could come in as a business record (Fed. R. Evid. 803(6)), but there is no indication that Michael Faro was under a business duty to speak when discussing observations about his wife's communications.  (Nor is it evident that the statement satisfies the personal knowledge requirement of Rule 602 of the Federal Rules of Evidence, which perhaps is why Plaintiffs do not rely on the document.)  Therefore, using the statement for the truth of the matter asserted, which is that Terry Faro reported the incident to Powell, is hearsay without an exception.  Fed. R. Evid. 801-802 (defining hearsay and providing

that hearsay is inadmissible unless an exception applies); *United States v. Patrick*, 248 F.3d 11, 22 (1st Cir. 2001) (statements made by informants in police notes were inadmissible because informants are not "part of the business of police."); Fed. R. Evid. 803(6) advisory committee's note (explaining the relationship of the rules to the teachings in the seminal case of *Johnson v. Lutz*, 253 N.Y. 124 (1930)); 2 MCCORMICK ON EVIDENCE § 290 (6th ed. 2006 supp.) ("If any person in the process is not acting in the regular course of the business, then an essential element in the trustworthiness chain fails.").

Even assuming for the sake of argument that the evidence is admissible, the only reasonable inference to draw is that Powell, who held the rank of sergeant at the time (Powell Dep. at 7-8), reported the information to Dozier's then-supervisor, Howe, who warned Dozier.

### 3. The Brandenburg Complaint

In 2001, Powell and Charnicky drove to Wisconsin to investigate a complaint that Dozier had made threatening phone calls to Laurie Brandenburg.[5] Pl. SOAF, Ex. K ("Charnickey Dep."), at 45. Lieutenant Charnicky was asked to go to Wisconsin, although he does not remember by whom, and the lieutenant in turn asked Powell to go with him because Powell had just been with DII. Def. Resp. Pl. SOAF, Ex. C Supp. ("Charnicky Dep. Supp."), at 79-80. At the time of the investigation, Powell was not Dozier's supervisor; Charnicky was Dozier's lieutenant. Def. SOF ¶¶ 5-6. Brandenburg stated that Dozier told her that he was investigating a criminal complaint and that if she did not stop driving past another woman's residence (Dozier's girlfriend) then Brandenburg would be arrested and her children would be taken away. Def. SOF ¶ 54; Pl. SOAF ¶ 14. Dozier admitted at his deposition that there had been no complaint filed with the police. Pl. SOAF ¶ 17; Dozier Dep. at 167. Powell testified at his deposition that he

---

[5] Brandenburg's name is now Laurie Terry. See Pl. SOAF, Ex. T (Terry[/Brandenburg] Aff.), at ¶ 1. For consistency's sake, the Court will refer to Terry as "Brandenburg" throughout this opinion, and will refer to Plaintiff's Exhibit T as the "Brandenburg Aff."

went with Charnicky to interview Brandenburg, but then did nothing else with regard to the complaint—that is, he did not speak to Dozier or otherwise follow-up to "see what happened." Pl. SOAF, Ex. W ("Powell Dep."), at 132. Neither Powell nor Charnicky interviewed Dozier's girlfriend although they were aware of her relationship with Dozier. Def. Resp. Pl. SOAF ¶ 16.

Charnicky testified at his deposition: "My understanding was that [Dozier] had contacted [Brandenburg] and according to her had threatened her by stating that she could be arrested I believe for stalking. * * * I think he felt that [Brandenburg] was stalking his girlfriend." Charnicky Dep. at 68. Charnicky filed with DII a memorandum about the incident along with Dozier's signed statement. Def. SOF ¶ 56. In Charnicky's memorandum, he wrote that "Brandenburg stated that she just wanted to notify the Illinois State Police regarding the telephone call and did not wish to pursue a complaint against [Dozier]." Pl. SOAF, Ex. S ("DII Brandenburg Case File"), at 4. Charnicky attached a statement apparently written and signed by Dozier. *Id.* at 5. The provenance of the document is not entirely clear, however: Dozier testified at his deposition that the statement was typed by *either* Charnicky or Dozier. "I don't remember who actually did the typing. I know I sat in his office writing and rewriting until it met what he wanted it to come across with." Dozier Dep. at 169.[6] Finally, Charnicky stated at his deposition that, although he sent the memorandum and statement to DII, he took no steps to ensure that Dozier did not repeat the misconduct. "I did nothing. I did not speak to Dozier about this complaint after the day he came in and wrote [his statement]." Charnicky Dep. at 76. Powell, too, stated that he did not take corrective action but also stated that he did not have the authority

---

[6] Subsequent statements during the deposition left ambiguities as to Charnicky's role in drafting the document. Dozier did not directly respond to the question of whether edits by Charnicky were non-substantive, although there is some indication that Charnicky's role was limited. Dozier stated in part, "I just remember him saying, Are [sic] you sure this is that you mean or is this how this is spelled." Dozier Dep. Supp. at 173.

to do so because he was not Dozier's supervisor at the time of the complaint.  See Pl. SOAF, Ex. KK ("Powell Admissions"), ¶¶ 5-9.

According to Brandenburg, Dozier informed her that "he was investigating a criminal complaint alleging that [she] was harassing [Dozier's girlfriend]."  Pl. SOAF, Ex. T ("Brandenburg Aff."), at ¶ 3.  Dozier threatened to have Brandenburg arrested and said that her children would be taken away.  *Id.*  Brandenburg complained to the Illinois State Police; she spoke to Charnicky and Powell and "was told that [her] complaint would be looked into."  *Id.* ¶¶ 4-5.  Brandenburg says that she called the Illinois State Police on several occasions and was told—by whom the affidavit does not make clear—that her complaint "was being handled."  *Id.* ¶ 8.  Contrary to what Charnicky wrote in his memorandum, Brandenburg states that she never told Charnicky that she did not wish to pursue her complaint.  *Id.* ¶ 6.

When DII closed its file on the complaint against Dozier, it checked the box for "Administrative Closing" and gave as its reason, "Complainant did not want to pursue matter." DII Brandenburg Case File, at 1.

### 4.     The Moylan Affair

In 2002, Shane Moylan complained to Powell that Dozier was having an affair with Moylan's wife, a reporter at a local paper.  Pl. SOAF ¶ 21; Def. SOF ¶ 59.  According to an interview of Moylan in 2005, whose contents Moylan says are accurate, Powell told Moylan that he and Dozier were friends and that nothing could be done about Dozier's "off-duty behavior." Pl. SOAF, Ex. FF ("Moylan Aff. & Interview"), at 1-2; Pl. SOAF ¶ 22.[7]  Dozier did not remember if Powell had ever talked with Dozier about the affair.  Dozier Dep. at 165.  The

---

[7] Defendant disputes the fact statement, at least in part: Powell stated in his deposition that he told Moylan that Moylan could file a complaint and that he does not remember telling Moylan that he was friends with Dozier.  See Def. Resp. Pl. SOAF ¶ 22; Def. SOF, Ex. D (Powell Dep.), at 111-12. Nonetheless, the summary judgment standards require the Court to accept Mr. Moylan's version of the events.

parties dispute whether the affair is the sort of complaint that should have been forwarded up the chain of command (Def. SOF ¶ 62; Pl. Resp. Def. SOF ¶ 62), although they do not dispute that Charnicky was never told about the complaint. Def. SOF ¶ 64.

Although two of Defendants' witnesses, including DII's Northern Commander, state that the affair would not have been required to be reported (Def. SOF ¶ 62; Def. SOF, Ex. P ("Casey Dep."), at 34), the DII commander also stated that she was not sure whether the affair violated departmental rules. Casey Dep. at 34. Charnicky, however, stated that Powell should have informed him of the complaint by Shane Moylan. Charnicky Dep. at 89-90.

### 5. The Medej Complaint

In October 2003, Charnicky asked Powell to look into a complaint that Dozier pulled over an alleged drunk driver (Rafal Medej) and locked (or otherwise denied to Medej) the keys in the car. Pl. SOAF ¶ 29; Charnicky Dep. at 100. Charnicky testified at his deposition that he asked Powell to look into the complaint, but that Charnicky took no further action and had no further conversations about the allegation after Powell "told [Charnicky] there was nothing to [the complaint]." Charnicky Dep. at 101. Charnicky did not inform either DII or the District Commander about the Medej complaint. Pl. SOAF, Ex. LL ("Charnicky's Answers to Plaintiffs' First Set of Requests to Admit"), at ¶¶ 31-34.

Powell testified that he *did* tell Charnicky that he had talked to Dozier but did not tell Charnicky that the report was unfounded. Powell Dep. at 120. Powell further testified that he was never asked by Charnicky to investigate the incident with Medej. Powell stated that it "would be [up to] Lieutenant Charnicky to get a DII case number and forward it." *Id.* However, Powell also testified that Charnicky did in fact ask Powell to "see what happened." *Id.* at 121. Powell says that he asked Dozier about the incident, and Dozier indicated that the incident

happened.  *Id.* at 121.[8]  Defendants admit that Powell never interviewed Medej.  Pl. SOAF ¶ 31.

During an administrative interview when Powell was accused in 2004 of wrongdoing related to

the Medej complaint, Powell could not recall what he reported to Charnicky: "I, I don't, I don't

recall if I told him [the complaint] was unfounded.  I think I told him I took care of it."  Pl.

SOAF, Ex. Y ("DII Medej/Powell Case File"), at 2.

Neither Powell nor Charnicky took any corrective or disciplinary action as a result of the

Medej complaint, with the exception of "informal[] yelling at Dozier" by Powell.[9]  Pl. SOAF ¶

36; Def. Resp. Pl. SOAF ¶ 36.  Because more than 180-days elapsed between the complaint to

the Illinois State Police and the ultimate report to DII—which occurred as a result of an

anonymous complaint in 2004—the DII "administratively closed" the complaint.  Pl. SOAF

¶ 39.  (Neither party explains why such administrative closures occur.)

### 6.  The McSweeney Complaint

In January 2005, Meeder did an initial investigation into allegations made by Brian

McSweeney that an ISP trooper was using binoculars to watch his fiancée, Michelle Geller,

undress.  Pl. SOAF ¶ 41.  Meeder talked to Dozier and determined that the complaint was

"unfounded" in a memorandum that he wrote to Charnicky.  *Id.*[10]; Def. SOF ¶ 81.  At the time

---

[8] Plaintiffs further state that "Powell made no documentation that the incident occurred" (Pl. SOAF ¶ 30), although Defendants correctly point out that Powell appears to have been referring to a different incident (see Def. Resp. Pl. SOAF ¶ 30).

[9] The record indicates that the informal yelling may have been for using his squad car to effect a stop while he was off duty.

[10] Defendants state that Meeder thought the complaint was criminal as opposed to administrative in nature and that there would be a separate administrative investigation.  Def. Resp. Pl. SOAF ¶ 42; see also Meeder Dep. at 144.  According to Meeder, a criminal complaint would be unfounded because Geller was standing in front of an un-curtained window where there would be no expectation of privacy.  Meeder Dep. at 153-54.  Under Illinois law, however, what actually matters was where *Dozier* was standing.  See *People v. Bergeson*, 627 N.E.2d 408, 410 (Ill. App. Ct. 1994) (discussing the "window-peeping" section of the disorderly conduct ordinance and reciting the statutory requirement that the violator stand on the property of the victim); 720 ILCS 5/26-1(a).  Based on the requirement, it seems that the perpetrator was

Meeder made his determination, he had not talked to Geller. Pl. SOAF ¶ 42. Meeder's memorandum stated in part:

> Mr. McSweeney advised that he did not want to file a formal complaint. Mr. McSweeney thanked me for the quick investigation of the complaint and advised that he thought I had already gone above and beyond what he thought would happen when he first called. Mr. McSweeney was satisfied with the information I gave him, doesn't want to file a complaint, and this case is closed.

Pl. SOAF, Ex. Z ("DII Geller/McSweeney Case File"), at 6 (capitalization altered). Meeder had not, at that point, spoken with Geller (Pl. SOAF ¶ 42) and had interviewed McSweeney only by phone. DII Geller/McSweeny Case File, at 8. Charnicky wrote in the memorandum that on January 18, 2005, he called Master Sergeant D.J. Jordan with DII and on the basis of the telephone conversation, DII agreed to consider the case closed.[11] DII Geller/McSweeney Case File, at 6.

McSweeney and Geller, however, remember the complaint differently, particularly with regard to the lauding that Meeder recalled. McSweeney stated: "[I never] express[ed] satisfaction that the complaint was appropriately or fully investigated. I never informed the Illinois State Police or any of its agents that I wished to drop the case or have the investigation closed." Pl. SOAF, Ex. BB ("McSweeney Aff."), at ¶ 4. "I believed this to be a serious incident of misconduct by a police officer. I expected it to be fully investigated and for the officer to be disciplined or discharged as a result." *Id.* ¶ 5. Geller's sentiments were nearly identical, and she too states that she never indicated that she wished the investigation to be dropped. Pl. SOAF, Ex. CC ("Geller Aff."), at ¶¶ 3-6.

---

not violating Illinois criminal law in this case. Whether the perpetrator violated state tort law is not entirely clear and could turn on whether a passerby could have seen Geller without the aid of binoculars. See *Schiller v. Mitchell*, 828 N.E.2d 323, 329 (Ill. App. Ct. 2005).

[11] Plaintiffs correctly point out that the statement is hearsay. It appears, however, that the notes fall into the business record exception, so long as Jordan was under a business duty to speak. See Fed. R. Evid. 803(6) advisory committee's note.

After the initial investigation was complete, Commander Tami L. Haukedahl required further investigation because she was "not comfortable with this 'as is'" and had additional questions about the investigation that she wanted answered. Def. SOF ¶ 85; DII Geller/McSweeney Case File, at 18. She stated that the allegations were serious and that, regardless of the complainants' wishes, additional investigation should be conducted. Def. SOF ¶ 86. Thereafter, additional investigation was conducted including in-person interviews with McSweeney and Geller, and several questions were posed by Haukedahl including whether Dozier had binoculars in his car, whether they were issued by the state, and so forth. DII Geller/McSweeney Case File, at 18.

Meeder subsequently concluded that Dozier was lying about his professed lack of involvement. Pl. SOAF, Ex EE ("Meeder Dep. #2"), at 254. And Meeder stated that Geller and McSweeney's version of events appeared both accurate and unrehearsed, including an accurate description of Dozier by Geller. DII Geller/McSweeny Case File, at 8. However, when Meeder ultimately interviewed Geller, Meeder reported that Geller stated that she did not wish to file a complaint against Dozier. DII Geller/McSweeney Case File, at 11. (As noted above, Geller contests that point.) Charnicky, for his part, testified that he was not concerned about the complaint. "I wasn't concerned. I wasn't sure [Dozier] did it." Charnicky Dep. at 160.

Several months later, Haukedahl recommended that the case be closed, in part because of the understanding that McSweeney and Geller wished that the investigation be closed. DII Geller/McSweeney Case File, at 4. At her deposition, Haukedahl stated that she received the information regarding McSweeney's wishes from Lieutenant Charnicky. Pl. SOAF, Ex. AA ("Haukedahl Dep."), at 34. The chain of memoranda that resulted in the investigation's closure

also concluded that the "preponderance of the evidence does not support" McSweeney and Geller's allegation. DII Geller/McSweeney Case File, at 4.

### 7. Summary of What Defendants Knew and What Steps They Took

There is record evidence that Sergeant Meeder was on notice of two prior acts by Dozier: the incident involving an invasive search of a female motorist and the incident underlying the McSweeney Complaint. Pl. Resp. Def. SOF ¶ 121. Meeder was not Dozier's supervisor at the time of the search of the female motorist. The only record evidence on file indicates that Meeder reported the incident to his superior.

There is record evidence that Sergeant Powell was aware of the Brandenburg complaint, the Medej complaint, and the Moylan complaint. Powell was not Dozier's supervisor at the time of the Brandenburg complaint.

There is record evidence that Charnicky was aware of the conduct underlying the complaints by Brandenburg, Medej, and McSweeney. Def. SOF ¶ 122. As to the Brandenburg complaint, there is evidence that he misrepresented Brandenburg's desire to see a thorough investigation. As to the Medej complaint, Charnicky did not report the incident to DII or to his district commander. As to the McSweeney complaint, Charnicky initially agreed that the investigation should have been closed based on Dozier's representations to Meeder and on McSweeney's (purported) representation that he did not wish to pursue the complaint.

### D. Dozier's Performance Evaluations

In August 2001, about five months after the Brandenburg complaint, Dozier received positive evaluations from Charnicky, including 7 out of 9 for decision making skills. Def. Resp. Pl. SOAF ¶ 54. In December 2002, Charnicky and Powell gave Dozier a positive evaluation, particularly for his "public service and relations." In December 2003, two months after the

Medej complaint, Powell and Charnicky gave Dozier positive reviews, including "exceeds expectations" in arrest-related activities. Pl. SOAF ¶ 55. The same was true of Dozier's reviews in December 2004. *Id.* After the McSweeney complaint in January 2005 and his arrest in July 2005, Dozier's performance evaluation suffered, although his scores were still in the satisfactory range. Def. Resp. Pl. SOAF ¶ 56. Dozier received satisfactory scores for both decision-making and efficiency under stress. Pl. SOAF, Ex. NN-2 ("Dozier Performance Evaluations"), at 25.[12] There was no part of his performance that was given a not satisfactory rating. *Id.*

## III.    Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual disputes that are irrelevant to the outcome of the suit "will not be counted." *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003) (quotation marks and citations omitted). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See

---

[12] Plaintiffs' fact statement ¶ 56 says that the ratings were given by Meeder and Charnicky but the review is signed by Charnicky and Haukedahl.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## IV.    Supervisory Liability Under 42 U.S.C. § 1983

42 U.S.C. § 1983 ("Section 1983") is not itself a source of liability. "[I]nstead, it creates a cause of action for the 'deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Narducci v. Moore*, 572 F.3d 313, 318-19 (7th Cir. 2009). In other words, Section 1983 is a vehicle for vindicating rights furnished elsewhere. *City of Oklahoma v. Tuttle*, 471 U.S. 808, 816 (1985).

In this case, Plaintiffs seek to use Section 1983 to vindicate Fourth Amendment protections. A police officer who unlawfully restrains an individual's movement commits an unlawful seizure within the meaning of the Fourth Amendment. See, *e.g.*, *Dunaway v. New York*, 442 U.S. 200, 207-08 (1979); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1180 (7th Cir. 1994) (stating that the two "crucial elements" of an unlawful seizure are coercive pressure from a state actor "resulting in a significant, present disruption of the targeted person's freedom of movement"); see also *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[T]he 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out."); *Campbell v. Miller*, 499 F.3d 711, 716 (7th Cir. 2007) (discussing the showing that is required in

order to conduct strip searches and body-cavity searches); *Burgess v. Lowery*, 201 F.3d 942, 947-48 (7th Cir. 2000) (Fourth Amendment right to be free from unreasonable strip searches is well established).

## A. The Deliberate Indifference Standard

There is no *respondeat superior* liability in Section 1983 actions. *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). That means that a defendant's status as supervisor of a constitutional tortfeasor is insufficient to impose liability. A supervisor must be personally involved in the conduct at issue. *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 614-15 (7th Cir. 2002). What matters are the supervisors' "knowledge and actions, not * * * the knowledge or actions of persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). Moreover, neither negligence nor gross negligence nor the typical civil standard for recklessness will suffice to impose supervisory liability. *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988). Rather, supervisors must be deliberately indifferent: they "must know about the [supervisee's] conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Chavez*, 251 F.3d at 651 (citing *Jones*, 856 F.2d at 992-93); see also *Burks*, 555 F.3d at 595 (Section 1983 does not turn supervisors into ombudsmen); *Anderson v. Cornejo*, 355 F.3d 1021, 1026-27 (7th Cir. 2004) ("The ostrich must know that there is a danger, before an inference of intent may be drawn."); *Armstrong v. Squadrito*, 152 F.3d 564, 581 (7th Cir. 1998) (observing that a supervisor could be liable for formulating a deliberately indifferent policy that caused a constitutional injury); *Doyle*, 305 F.3d at 615 (supervisor must "essentially direct[] or consent[] to the challenged conduct"). "[I]n a case alleging a failure to detect and prevent a subordinate's misconduct * * * the supervisor must act at least with deliberate indifference toward the misconduct." *Gibson v. City of Chicago*, 910 F.2d 1510, 1523 (7th Cir. 1990).

The seminal case on deliberate indifference and supervisory liability is *Farmer v. Brennan*, 511 U.S. 825 (1994). In that case, the Supreme Court held that a supervisor had to be deliberately indifferent to an "excessive risk" to a plaintiff's health and safety in order to impose liability. And critically, the Supreme Court resolved a circuit split about what deliberate indifference means. The Court held that a supervisory official must both (i) have objective awareness of facts from which an inference could be drawn that the plaintiffs were exposed to an excessive risk and (ii) actually draw the inference. *Id.* at 837. (Although *Farmer* was an Eighth Amendment case and most of the deliberate indifference cases involve alleged Eighth- or Fourteenth-Amendment violations, courts have discussed the same standards in Section 1983 actions based on other amendments. See *Int'l Action Center v. United States*, 365 F.3d 20, 23, 28 (D.C. Cir. 2004) (Roberts, J.) (First and Fourth Amendment case); *Lanigan v. Vill. of E. Hazel Crest, Illinois*, 110 F.3d 467, 477-78 (7th Cir. 1997) (evaluating a supervisory liability claim for Fourth Amendment violations using the deliberate indifference framework). The parties agree that the deliberate indifference framework provides the yardstick for evaluating whether the case should survive summary judgment—but they disagree on how Plaintiffs' case measures up.

To begin the measuring process, it is worth examining in closer detail the teachings regarding deliberate indifference. And, as intimated, the effort begins with *Farmer v. Brennan*, where the Supreme Court announced—and described important features of—the deliberate indifference standard. See generally 511 U.S. 825 (1994). Dee Farmer was a transsexual who brought a *Bivens* suit against prison officials who put him in the general prison population where he was raped. Farmer's complaint argued that prison officials placed Farmer in the prison's "general population despite knowledge that the penitentiary had a violent environment and a history of inmate assault, and despite knowledge that petitioner, as a transsexual who 'projects

female characteristics,' would be particularly vulnerable to attack" by other inmates.  *Id.* at 831.

The conduct, he claimed, violated his Eighth Amendment right to be free from cruel and unusual punishment.  The parties agreed that the appropriate legal standard for imposing liability was "deliberate indifference," but disagreed about the meaning of the term.

The Supreme Court, after grappling with its own case law on the question, concluded that deliberate indifference lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other"—the Court then adopted the *mens rea* requirement for criminal recklessness.

> We hold * * * that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837.  The Court rejected an argument that what an official "should have known" could serve as a font of liability: "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned" as a constitutional violation.  *Id.* at 838.  What matters is subjective awareness. Further, if the supervisor responds reasonably to a substantial risk of which she was actually aware, then she cannot be found liable.  *Id.* at 844-45.  However, in order to impose liability a supervisor does not have to actually believe that harm will occur—rather, "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  *Id*. at 842.

Subsequent cases have fleshed out other important aspects of establishing deliberate indifference in supervisory liability cases.  Among other things, the cases teach that both knowledge and deliberate indifference "can be proved * * * with circumstantial evidence"

(*Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (deliberate indifference); *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996) (actual knowledge)), that the deliberate indifference standard applies to various constitutional amendments (see, *e.g.*, *Int'l Action Center*, 365 F.3d at 23, 28 (First and Fourth Amendments)); that "plainly inappropriate responses" to a known risk may support an inference of deliberate indifference (*Hayes*, 546 F.3d at 524; *Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001) (discussing mounting evidence)); and that the mere possibility in hindsight of better responses by a supervisor is insufficient to establish deliberate indifference (*Palmer v. Marion County*, 327 F.3d 588, 593 (7th Cir. 2003)).

Critically, the case law also teaches that supervisors may be liable under Section 1983 for a tort committed by a subordinate where the supervisors were aware of earlier complaints that pertained to individuals other than the plaintiff. See, *e.g.*, *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996); *Shaw v. Stroud*, 13 F.3d 791, 799-800 (4th Cir. 1994); *Gibson*, 910 F.2d at 1523 (discussing "a case alleging a failure to detect and prevent a subordinate's misconduct" and concluding that the district court should not have granted summary judgment in favor of the supervisor).

Finally, surveying the case law as a whole reveals—unsurprisingly, given that these cases involve the quanta of proof necessary to infer mental states, arise in a variety of factual settings, and demand inquiry into causation—that the cases are fact-specific. As Judge Posner has observed while engaging in a similar analysis (albeit in a different legal setting):

> [W]hat is excessive, intolerable, etc., depends on the nature of the defendant's conduct. * * * The greater the risk * * * the more obvious it will be to the risk taker, enabling the trier of fact to infer the risk taker's knowledge of the risk with greater confidence.

*Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 694-95 (7th Cir. 2008) (liability of donors to terrorist organizations). Similarly, the more serious misconduct is at an earlier time,

the more it will support an inference that a supervisor ignored a substantial, known risk of constitutional injury to a foreseeable plaintiff at a later time. And the nature of the misconduct, in addition to establishing state of mind, speaks to causation: if the nature of the misconduct at the earlier time is too different from the misconduct that occurs at the later time, causation may be deemed too attenuated. See, *e.g.*, *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788 (7th Cir. 2003). Because much of the dispute between the parties relates to causation, it merits additional discussion.

### B.    A Closer Look at Causation

As a general matter, courts analyze causation in supervisory liability cases using familiar principles of proximate cause. *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985) (stating that the causal connection in a Section 1983 supervisory liability case may be "established when a history of widespread abuse puts the responsible supervisor on notice * * * and the official fails to take corrective action"); *Jones*, 856 F.2d at 993 ("elementary principles of legal causation * * * are as applicable to constitutional torts as to common law torts"); *Taliferro v. Augle*, 757 F.2d 157, 161-62 (7th Cir. 1985) (Section 1983 was adopted against a background of common law tort principles on causation, which principles apply "unless unsuitable" to the statute); *Hibma v. Odegaard*, 769 F.2d 1147, 1155 (7th Cir. 1985) ("The general principles of tort liability govern the liability imposed under [Section] 1983 * * *."); *Crowder v. Lash*, 687 F.2d 996, 1002 (7th Cir. 1982) (plaintiff in a Section 1983 case must prove proximate causation); see also Sheldon H. Nahmod, Civil Rights and Civil Liberties Litigation: The Law of Section 1983 § 3:105 (4th ed. 2009) (opining that "it is probably better that courts * * * continue to use the language of proximate cause, which is in fact the case") (footnote omitted). The Supreme Court, too, has indicated that a plaintiff must prove

proximate causation. *Martinez v. State of California*, 444 U.S. 277, 285 (1980) (citing *Palsgraf v. Long Island R. Co.*, 248 N.Y 339, 162 N.E. 99 (1928) and holding that a parole board was not responsible in a section 1983 case where a parolee killed a victim five months after being released because causation was "too remote").

Of course, proximate cause itself can be thought of as an umbrella term for concepts that help to answer the policy question of when liability should be imposed on an alleged tortfeasor. *First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 570 (7th Cir. 2009) (proximate cause includes policy considerations); *Raybestos Prods. Co. v. Younger*, 54 F.3d 1234, 1243 (7th Cir. 1995) (same); RESTATEMENT (SECOND) OF TORTS § 431, 433 & accompanying comments (1965) (explaining proximate cause, the concept's relationship to "philosophical" cause, and listing factors that bear on the proximate cause analysis). Three aspects of proximate cause commonly appear in Section 1983 supervisory liability cases: (1) the fit between earlier and later misconduct; (2) the number of prior incidents; and (3) the time lag between incidents.[13]

Several cases stand for the proposition that prior misconduct and subsequent misconduct must be sufficiently similar to warrant imposing liability. There must be a sufficient nexus between the two. *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003) (plaintiffs were required to show "a connection between any knowledge or suspicion of risk that the defendants may have had" and the injury that was ultimately suffered). The idea is commonsensical: if the underlying conduct could not have put the actor on notice of the subsequent harm, then a supervisor cannot have been deliberately indifferent. See *id.* at 793-94 (reasonable jury could not conclude that awareness of licensing problems in a foster home would

---

[13] And note that the prior incidents also speak to whether there was, objectively, a substantial risk of serious harm to the plaintiff and may serve as circumstantial evidence of the required subjective mental state.

make defendants aware of likelihood of sexual abuse); *cf.* RESTATEMENT (SECOND) OF TORTS § 435(2) & cmt. c (actor not liable for harms that are "highly extraordinary" in relation to the underlying conduct).  See also *Kitzman-Kelley v. Warner*, 203 F.3d 454, 459 (7th Cir. 2000) (no deliberate indifference in hiring where "less than careful scrutiny of an applicant result[ed] in a generalized risk of harm"); *Jones v. Wellham*, 104 F.3d 620, 628 (4th Cir. 1997) (as with municipal liability, supervisory liability requires a "close affirmative link between [earlier] conduct and a resulting constitutional violation by a subordinate").  But see *Camilo-Robles v. Hoyos*, 151 F.3d 1, 14 (1st Cir. 1998) (causation *not* too attenuated where summary judgment record indicated that supervisory officials knew that an officer was a "ticking time bomb" who "was likely to commit acts that would violate the constitutional rights of others").

Another aspect of causation that appears in supervisory liability cases relates to the number of prior incidents of which the supervisors were aware.  The only bright (or at least mostly bright) line in this realm appears to be that a single incident of past wrongdoing is insufficient to impose liability on supervisors for a subsequent tort.  *Shaw*, 13 F.3d at 799 (quoting *Slakan v. Porter*, 737 F.2d 368, 372-73 (4th Cir. 1984)).  Beyond that, the general teaching is that multiple acts provide greater support for an inference that deliberate indifference caused a subsequent injury.  Compare *Gibson*, 910 F.2d at 1512, 1522 (not expressing an opinion on the merits of the claim but concluding that plaintiff should get discovery in a case in which there had been multiple claims against the subordinate), with *Estate of Cole v. Fromm*, 94 F.3d 254, 258 (7th Cir. 1996) (no liability where no prior complaints to supervisors).  There is case law imposing liability on supervisors who had knowledge of as few as two prior incidents of misconduct.  *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996).[14]

---

[14] Defendants correctly note in their reply brief that the number of incidents is not divorced from the character of the underlying incidents.

The passage of time also bears on the proximate causation inquiry, although gaps of time do not automatically break the chain of causation. See RESTATEMENT (SECOND) OF TORTS § 433(c) & cmt. f (lapse of time bears on causal inquiry, but liability should still be imposed where evident that the actor's conduct was a substantial factor that contributed to the injury). As one commentator has observed, "the term proximate causation is both picturesque and unfortunate because its literal meaning suggest that only the 'last' or 'nearest' event could be held responsible for the harm in question." Richard A. Epstein, TORTS § 10.9 at 263 (1999). Overall, the cases impart the predictable guidance that large gaps in time will generally sever the causal chain while smaller gaps in time will not. Compare *Wellham*, 104 F.3 at 626 (prior conduct in 1979 and 1980 was too attenuated from conduct that occurred in 1990 to satisfy Section 1983's causation requirement), with *Shaw*, 13 F.3d at 800 (supervisor liable for the "natural consequences of his actions," including those occurring fifteen months after the supervisor ceased supervising the subordinate). The passage of time bears on the inquiry but is not talismanic—in either direction. *Cf. Martinez*, 444 U.S. at 279 (no liability in case in which parolee killed a fifteen-year-old girl five months after the parolee was released).

## V.    Analysis

The analysis includes only those incidents of which Defendants were aware. Plaintiffs have pointed in particular to sexual misconduct by Dozier when Dozier worked for the Zion Park District (see *supra* note 4), but the record evidence indicates only that Dozier's supervisors failed to inquire into the reason for Dozier's separation from that position. That makes them negligent at best; there is no evidence that Defendants failed to inquire into Dozier's job status for fear of what they might have learned. Because liability cannot be imposed based on incidents of which a supervisor "should have been aware," even when a duty to know is imposed by statute, the

sexual misconduct does not enter into the Court's analysis in this case. *J.H. ex rel. Higgin*, 346 F.3d at 793 ("plaintiffs' theory of statutorily-imposed knowledge falls short of satisfying their burden of proof").

Defendant's summary judgment motion argues, in general, that Defendants did not (1) have sufficient knowledge such that (2) liability can be imputed to them for (3) dissimilar acts committed by Officer Dozier. With respect to master sergeants Powell and Meeder, the Court agrees.

In making their argument, Defendants emphasize *Wedgeworth v. Harris*, 592 F. Supp. 155 (W.D. Wis. 1984). In *Wedgeworth*, Judge Shabaz concluded that supervisory officials could not be held liable for the sexual misconduct of a police officer who forced a victim to have sexual intercourse. The court reasoned that the misconduct of which officials were aware—one (ongoing) investigation into a sexual assault—was too attenuated from the conduct for which the plaintiff sought recovery. *Id.* at 161 (cataloging the limited information that the supervisors had and noting the disconnect between the prior misconduct and the misconduct which led to the lawsuit).

Defendants cite several other cases for the proposition that prior incidents of misconduct "must be similar to the conduct at issue in order to give rise to a claim [sic] of deliberate indifference." Def. Mem. at 7. In *Anderson v. Cornejo*, 355 F.3d 1021 (7th Cir. 2004), ninety plaintiffs alleged that Customs personnel singled them out for non-routine searches (some quite invasive) upon re-entry into the United States. The Customs personnel were alleged to have engaged in the conduct though they lacked reasonable suspicion and were more likely to single out black women. The appellants in the *Bivens* case were supervisors. *Id.* at 1022. One of the supervisors was in charge of the inspectors who dealt with arriving passengers. Twelve

passengers had complained about discrimination based on race, although the plaintiffs were basing their theory on a combination of discrimination—both race and sex.  The Seventh Circuit concluded that even if the supervisor could have engaged in a better investigation, the supervisor "could not be task[ed] * * * with deliberate indifference toward the complained of discrimination."  *Id.* at 1027.  After noting the dearth of complaints in relation to the millions of people who pass through O'Hare Airport's customs screening stations and the district court's failure to employ the *Farmer v. Brennan*, deliberate indifference standard, the court concluded: "[T]he record does not demonstrate that by failing to investigate a handful of complaints competently, [the supervisor] displayed deliberate indifference to the sort of discrimination alleged here."  *Id.*

Defendants also cite two Eighth Circuit cases.  In *S.J. v. Kansas City Missouri Pub. Sch. Dist.*, 294 F.3d 1025, 1028 (8th Cir. 2002), the court of appeals held that a school district did not show deliberate indifference to unconstitutional misconduct where a volunteer, accused of sexual abuse, had earlier been accused of making sexually inappropriate comments at a slumber party for the volunteer's stepdaughter.  When the earlier comments were reported, the principal at that school revoked the volunteer's privileges at that school.  "Such an isolated incident, moreover, *unrelated to Mr. Robertson's role as a school volunteer*, cannot furnish the basis for finding a pattern of unconstitutional conduct by school district employees or volunteers."  *Id.* at 1029 (emphasis added); see also *id.* (noting the rapidity with which the abuse allegations were reported to child welfare authorities).

The second Eighth Circuit case is *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790 (8th Cir. 1998).  In *Rogers,* the court of appeals upheld the district court's dismissal of an action against a police chief, whom the plaintiff alleged was deliberately indifferent to the conduct of an

officer who had been the subject of two prior complaints and subsequently raped a woman after a traffic stop. The court stated that in order for liability to attach in a Section 1983 action based on deliberate indifference, the plaintiff must show that the defendant "had notice of a *pattern* of unconstitutional conduct by subordinates and exhibit[] deliberate indifference to or tacit authorization of the conduct." *Id.* at 800 (emphasis added). The court reasoned that no deliberate indifference could be shown because the prior complaints had been investigated adequately—"[b]oth allegations were investigated, and one resulted in [the officer's] suspension for ten days and the other was not sustained because there were no witnesses." *Id.*

The parties make specific arguments with regard to the respective defendants. The Court addresses the cases against each in turn.

## A.      Sergeant Meeder

The Court agrees that Sergeant Meeder is entitled to summary judgment, although the matter is not as clear-cut as Defendants would have it. Defendants argue that the only complaint of which Meeder was made aware during the time that he supervised Dozier was the "McSweeney" complaint. Def. Mot. at 2. The McSweeney complaint involved allegations that Dozier spied on Michelle Geller, McSweeney's fiancée in January 2005, a few months prior to Plaintiffs' Dozier Encounter. According to Defendants, "[r]ather than * * * turning a blind eye to the McSweeney complaint, Meeder wrote in his report that McSweeney's and his fiance's [sic] versions of the incident appeared 'accurate and unrehearsed.'" Def. Mot. at 9.

It is not quite that simple, of course. If indeed there were undisputed facts showing that Meeder took reasonable steps to investigate the McSweeney complaint, then Meeder would find himself comfortably within the safe-harbor that the Supreme Court discussed in *Farmer v. Brennan*. 511 U.S. at 844-45 (no liability where supervisor responds reasonably). But the

summary judgment record is more mixed than Defendants portray it. The most damaging evidence is that Meeder acted to thwart the investigation in its early stages. Specifically, there is record evidence that Meeder misrepresented McSweeney and Geller's desires by saying that McSweeney did not wish to pursue the matter. Moreover, the investigation into the complaint was thorough—but only after Commander Haukedahl determined that the initial investigation had been inadequate. A finder of fact reasonably could conclude that Meeder, by acting to cover up the incident, condoned Dozier's conduct in spying on Geller. *Jones*, 856 F.2d at 992-93 (to be deliberately indifferent the supervisor "must know about the [supervisee's] conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see").

The fact that higher-ups within the Illinois State Police ultimately made the decision to close the investigation does not alter the analysis. Commander Haukendahl made the recommendation that the case be closed, but she relied on an investigation conducted in part by Meeder, including the now-contested assertion that McSweeney and Geller did not want to pursue the matter. If Meeder was thwarting the investigation and the case file was closed based in part on his efforts, then the closure hardly helps Meeder's case. See *Nanda v. Moss*, 412 F.3d 836, 843-44 (7th Cir. 2005) (ratification and facilitation of conduct through false communications). Moreover, what matters under the deliberate indifference standard is what the *defendants* knew. This is not a case in which the defendants were relying on information from others (see, *e.g.*, *J.H. ex rel. Higgin*, 346 F.3d at 794)—Meeder and Charnicky were conducting the investigation, and if they failed to respond reasonably to a known threat then they cannot take shelter in the *Farmer v. Brennan* safe harbor. On that score, Meeder's initial interview with Dozier revealed that Dozier was precisely where McSweeney's complaint says he was (Dozier claimed to have been engaged in other activity). That fact, combined with evidence that Meeder

lied about McSweeney's wishes, would allow a jury reasonably to infer that Meeder did not want to know more about the allegations for fear of what he might learn.[15]  And "[o]nce the official knows of [a] risk, the refusal or declination to exercise the authority of his or her office"—in this case by conducting an investigation—"may reflect deliberate disregard."  *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996); see also *Chapman v. Jarrell*, 2005 WL 3088422, *4 (S.D.W.Va. Nov. 17, 2005).

Summary judgment in Meeder's favor is appropriate for a different reason: even if Meeder condoned Dozier's conduct with regard to the allegations that Dozier spied on Geller, there is an insufficient nexus between the McSweeney complaint and the conduct of which Plaintiffs complain.  In addition to the gap in time between incidents, the case law shows that courts look at both the number of prior incidents and the fit between the character of the prior incidents and the subsequent incidents.  Only the temporal gap favors Plaintiffs, but that alone is not sufficient to support a jury verdict in their favor.

As to the number of prior incidents, Plaintiffs have not presented the Court with a case in which liability was imposed against a supervisor for a constitutional tort when the supervisor was aware of a single incident of prior misconduct.  The only case law of which the Court is aware indicates that a single incident ordinarily will not be sufficient to establish causation.  *Estate of Davis v. City of North Richland Hills*, 406 F.3d 375, 382-83, 386 (5th Cir. 2005) (stating the general rule but noting that a single incident could be sufficient in the appropriate case).  Two is the minimum number of incidents that have proved sufficient to find causation in the reported cases.  See *Andrews*, 98 F.3d at 1078.  That makes sense.  In the mine run of cases at least, it is

---

[15] The inference is not demanded.  Assuming that a jury found that Meeder lied about McSweeney's wishes, as the Court must, a jury nonetheless could infer that Meeder lied because he thought the complaint was meritless.  But the Court cannot choose among competing inferences at summary judgment.

difficult to conceive that condoning a single bad act can be said to have caused the subordinate to commit a subsequent bad act. In contrast, a pattern of condoning, ratifying, or covering up bad acts makes it more reasonable for a fact finder to conclude that a supervisor caused the subordinate's subsequent constitutional torts. Again, the outcome makes sense: a subordinate whose supervisors consistently look the other way or cover-up misconduct might be emboldened and commit acts that he otherwise would have eschewed, had the earlier conduct been repudiated. See *Woodward v. Correctional Med. Svcs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (inference of deliberate indifference may be supported "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned" the misconduct); *cf. also Vasquez v. County of Los Angeles*, 349 F.3d 634, 655 (9th Cir. 2003) (noting in a Title VII case that where an employer tolerates misconduct it encourages additional misconduct); *Gollomp v. Spitzer*, 568 F.3d 355, 372 (2d Cir. 2009) (commenting in the context of litigation sanctions that an overly lenient regime could embolden lawyers to make improper submissions to courts).

Moreover, the *character* of the prior bad act in this case does not support the notion that this is an exceptional case in which a single prior act would prove sufficient to impose Section 1983 supervisory liability. Plaintiffs do not argue that spying on Geller using binoculars was a Fourth Amendment violation. See also *On Lee v. United States*, 343 U.S. 747, 754 (1952) ("The use of bifocals, field glasses or the telescope to magnify the object of a witness' vision is not a forbidden search or seizure, even if they focus without his knowledge or consent upon what one supposes to be private indiscretions."); Joshua C. Dressler & Alan C. Michaels, UNDERSTANDING CRIMINAL PROCEDURE § 6.09[A], at 97 (2006) (observing that *On Lee* appears to remain good

law even though it preceded the significant shift in Fourth Amendment law that was brought about by *Katz v. United States*).  Instead, Plaintiffs have noted the sexual overtones of the misconduct.  However, the conduct is different from Plaintiffs' encounter with Dozier in a meaningful way: the spying on Geller did not involve the abuse of authority as a police officer.  Unlike other incidents of misconduct or arguable misconduct, such as the alleged telephone harassment of Laurie Brandenburg or the seizure of Medej's car, Dozier did not use his authority as a police officer against Geller—he acted as a peeping tom.

The only consideration that supports a nexus between the McSweeney complaint and the Dozier Encounter is the short temporal gap between the two.  But the gap in time is just a factor that courts consider.  Absent a causal mechanism, which the above analysis reveals to be lacking, two events that occur close in time are merely correlated with one another, and the timing is not dispositive.  See, *e.g.*, *Martinez*, 444 U.S. at 279; *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1044 (7th Cir. 1988) (citing *Ste. Marie v. Eastern R.R. Ass'n*, 650 F.2d 395, 400 (2d Cir. 1981) (Friendly, J.)).

Plaintiffs, argue that Meeder was "certainly on notice of a pattern of misconduct" (Pl. Mem. at 17) because Meeder also was aware of an incident in 1998 or 1999, in which Dozier was accused of inserting his thumbs underneath a motorist's bra.  However, Plaintiff has failed to marshal record evidence that Meeder did not respond appropriately.  Meeder stated that he reported the incident up the chain of command when he received word of the allegation.  Plaintiffs, in their response, state that Defendants have not produced documentary evidence related to that investigation.  Plaintiffs could have had a stronger argument, as the absence of a business record can constitute evidence that a given activity did not take place.  Fed. R. Evid. 803(7) (hearsay exception for business records applies to the absence of business records).

Yet, as noted in the facts section of this opinion, Plaintiffs have not pointed to a request that they made for such records—they state only that Defendants have failed to come forward with enough evidence. That is more than Defendants must do to obtain summary judgment. Defendants pointed to record evidence that Meeder in fact took reasonable steps to report the misconduct. Plaintiffs have not offered any fact statements of their own regarding the incident, and denied that Meeder reported the incident to Master Sergeant Howe because department policies would have directed Howe to write a report. Pl. Resp. Def. SOF ¶ 51. But that is speculation, and indeed is inconsistent with the evidence that DII files were not always created, as with the Medej complaint. Moreover, Plaintiffs have not presented the Court with any indication that somewhere in the (voluminous) record there is a request for a DII file on this matter that went unfilled. When Defendants marshaled the evidence that Meeder reported the incident to Howe, it then became Plaintiffs' duty to present record evidence that refuted Defendants' assertion, whether by the absence of a business record or otherwise. *Eberts v. Goderstad*, 569 F.3d 757, 767 (7th Cir. 2009) (summary judgment is "the put up or shut up moment" in the life of a case). Likewise, there is no indication that Meeder had information indicating that the motorist's complaint against Dozier was meritorious. *Estate of Davis*, 406 F.3d at 384 n.45 (noting that there are "likely many" unsubstantiated complaints against police officers and if the mere fact of complaints were sufficient to give rise to supervisory liability then there would be, in effect, *respondeat superior* liability for supervisory officers).

Because Plaintiffs have not established a sufficient nexus between the McSweeney complaint and Plaintiffs' allegations, no reasonable finder of fact could conclude that by working to cover up the McSweeney complaint, Meeder caused Plaintiffs' constitutional deprivation. Like one of the defendants in *Shaw*, the Court concludes that Meeder "simply did not exhibit the

tacit authorization of or deliberate indifference to constitutional injuries required for § 1983 supervisory liability."  13 F.3d at 801 (quotation marks omitted).

## B.       Sergeant Powell

Plaintiffs argue in their opposition that Powell was "aware of at least four complaints against Dozier: Faro, Brandenburg, Moylan, and Medej."  Pl. Mem. at 16.  It is prudent at the outset to do a bit of pruning, however.  The Moylan complaint pertained to allegations that Dozier took part in an extramarital affair.  The parties dispute whether the affair violated department policy.  However, the Court concludes that the extramarital affair simply is too attenuated from the Dozier Encounter.  There is no evidence that Dozier abused his position as a police officer to coerce anyone—there is evidence only of a serious moral lapse.[16]  And although Charnicky testified that Powell should have reported the incident to him, that failure does not transform a moral failing into a harbinger of a constitutional violation.  See also *Kernats v. O'Sullivan*, 35 F.3d 1171, 1175 (7th Cir. 1994) (Section 1983 liability cannot be imposed for a violation of state tort law or other conduct that is "perfectly legal, though unseemly and reprehensible").  Another incident that must be removed from consideration is the Faro spying allegations.  As the Court explained in the fact section, there is no admissible record evidence that Terry Faro contacted Powell to complain about Dozier.

That leaves two incidents, Brandenburg and Medej.  As to the Brandenburg complaint, in which Dozier was alleged to have made a harassing phone call in 1999, Powell was not Dozier's

---

[16] The same goes for Plaintiffs' arguments related to Powell permitting Dozier to drove his squad car while off duty.  See *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 93-94 (1st Cir. 1994) (subordinate officer having a child out of wedlock and wearing a sweater to court, among other things, could not have alerted the supervisor to the need to supervise his subordinate more closely).

supervisor at the time of the incident. He was a sergeant[17], not a master sergeant—Plaintiffs have not fleshed out what, if any, supervisory responsibilities Powell had. See Powell Dep. at 7-8; Pl. Resp. Def. SOF ¶¶ 5. Rather, Powell was asked to accompany Charnicky because Powell had recently served with DII. Of course, Powell's position cannot be used to discount the complaint out of hand—again, the deliberate indifference inquiry focuses on knowledge. Just as the court in *Shaw* rejected the argument that a defendant could not face liability where he stopped supervising a subordinate before the subordinate's constitutional tort, a supervisor should not escape liability based on information he garnered before becoming a supervisor. Such a formalistic distinction loses cite of the supervisor's actual knowledge and inferences, which together constitute the lodestar of the deliberate indifference analysis.

The problem for Plaintiffs is that there is no evidence that Powell acted inappropriately with respect to the Brandenburg complaint. Plaintiffs assert in their statement of facts that "Charnicky and Powell falsely reported to ISP that Laurie Brandenburg did not want to file a complaint against Dozier." Pl. SOAF ¶ 15. In support of that statement, Plaintiffs cite page 171 of Charnicky's deposition testimony and a memorandum that Lieutenant Charnicky wrote, which is contained in the pertinent DII case file. The cited deposition testimony simply recounts Charnicky's version of events—that Brandenburg did not wish to pursue the matter. The case file does the same. DII Brandenburg Case File, at 4. Neither avers that the alleged representations were made to Powell, and more importantly neither source indicates that the representations were *relayed* by Powell. And critically, Plaintiffs have left out what if any duty Powell owed as a sergeant: Although Powell did not follow up on the investigation (Powell Dep. at 132), there is no evidence that he should have followed up given his seemingly fleeting role in

---

[17] The parties have not submitted the job description for the position of sergeant in the Illinois State Police.

the investigation. Likewise, there is no evidence that Powell had any authority to discipline Dozier in any way. The deliberate indifference framework does not turn supervisory officers into ombudsmen of their subordinates (*Burks*, 555 F.3d at 595), and *a fortiori* does not task subordinate officers with ensuring that their superiors (in this case, Charnicky) properly handle complaints once they report incidents up the chain of command.

That leaves Plaintiffs with the Medej complaint, which indeed provides some support for Plaintiffs. According to Defendants it was perfectly permissible to deny Medej his car keys after he purportedly failed a field sobriety test. On the undeveloped facts, Defendants' assertion is unpersuasive. We do not know if Medej was driving drunk, because the allegation was never investigated. We do know that Medej called to complain about the incident after it happened, which supports the inference that he was not driving while intoxicated and was rather displeased with Dozier's seizure of his automobile.[18] A deliberate indifference case can be maintained on a willful blindness theory. To that end, Powell testified that he talked to Charnicky—and while the two disagree about what was said, the investigation was patently perfunctory. Charnicky testified that he asked Powell to look into the complaint. Pl. SOAF ¶ 29; see also Powell Dep. at 121 (Charnicky asked Powell to "see what happened"). And although Powell apparently concluded that Dozier acted inappropriately—Powell engaged in "informal[] yelling at Dozier" (Pl. SOAF ¶ 36)[19]—he did not document his conversations with Dozier. See. Pl. SOAF, Ex. KK ("Powell Request to Admit"), at ¶¶ 33, 39. Powell either told Charnicky that the complaint was unfounded (Charnicky Dep. at 101) or told Charnicky that he "took care of" the complaint (DII

---

[18] To be sure, there is at least one recent case which a person may have blown the whistle for drunk driving on herself (see *Woman Driving Drunk Calls 911 on Herself*, St. Paul Pioneer Press Nov. 4, 2009, at B2), but again the facts are not known because there was no investigation.

[19] This may have been just for improperly using his car to effect a stop while he was off duty.

Medej/Powell Case File, at 2). Powell did not contact Medej, nor did he contact the Gurnee Police Department, which department was also involved in the stop.

Nonetheless, even if a jury could find that Powell buried his head in the sand, that still leaves Plaintiffs with a nexus problem: the admissible record evidence even when viewed in the light most favorable to Plaintiffs shows only that Powell was aware of misconduct with respect to the Medej complaint in 2003.

The Court concludes that causation is too attenuated for a reasonable jury to conclude that Powell's supervision caused Plaintiffs' alleged constitutional deprivation. The single incident from which a jury reasonably could infer knowledge of misconduct is insufficient to find a sufficient nexus. Although it might be possible to establish causation based on a single incident in an appropriate case, this is not the case. In *Tuttle*, the Supreme Court noted that *Monell* liability might be imposed based on a single incident of misconduct if the misconduct were linked to an unconstitutional policy. 471 U.S. at 823-24. "But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.* at 824 (footnotes omitted). Similarly, if a plaintiff were to come forward with circumstantial evidence showing that a subordinate was emboldened by his supervisor's willingness to look the other way, then a jury might be able to infer causation. But here there merely is knowledge of a single incident roughly a year and half before Plaintiffs' encounter with Dozier. As the Fourth Circuit has helpfully explained, causation in these sorts of cases requires a showing that the ultimate violation was "almost bound to happen sooner or later, rather than merely likely to happen in the long run." *Wellham*, 104 F.3d at 627 (evaluating a *Monell* claim but then making clear that the

same analysis applied to the supervisory liability claim). The single incident that Plaintiffs are able to point to would not allow a jury reasonably to draw that inference.

### C. Lieutenant Charnicky

The Court denies Defendants' motion with respect to Lieutenant Charnicky. The circumstantial and direct evidence that is lacking with respect to Master Sergeants Powell and Meeder is present as to Lieutenant Charnicky. There are several facts that would allow a jury to conclude that Charnicky was deliberately indifferent and that Dozier was emboldened to commit constitutional violations as a result of overly permissive, even complicit, supervision. Indeed, to the extent that the objective component of the deliberate indifference framework—an excessive risk of harm—would not have been present based merely on Dozier's misconduct, a trier of fact could conclude that tacit authorization by Charnicky *increased* the risk that Dozier would commit constitutional violations. The evidence is sufficient to show deliberate indifference and establish causation.

With respect to Brandenburg, there is evidence that Charnicky misrepresented Brandenburg's desire to see the investigation through to completion. Put simply, a jury could conclude that Charnicky was lying for Dozier in the hopes of closing the investigation quickly. That conclusion would be supported by the record evidence suggesting that Charnicky helped Dozier write his statement and Charnicky's failure to talk to (or report the involvement of) Dozier's girlfriend. In addition, Charnicky stated that he took no steps to ensure that Dozier did not repeat misconduct that was in violation of department policy.[20] In short, if the jury concluded that Charnicky actively worked to cover up the Brandenburg complaint, that fact could be used to support inferences of both a culpable mental state and an increased risk of harm.

---

[20] The parties dispute whether the telephone call to Brandenburg was in fact inappropriate, but there was testimony that misrepresenting that a complaint had been filed in the case would by itself have been a violation of department policy. Dozier has admitted that no complaint was ever filed.

"There is no such thing as accidental or inadvertent participation in a conspiracy." *Jones*, 856 F.2d at 993 (jury could find supervisors liable where they knew about subordinates' constitutional violation, had approved "false steps" and taken other acts to further subordinates' conduct); *Woodward*, 368 F.3d 917, 927 (7th Cir. 2004) (inference of deliberate indifference may be supported "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on an by failing to do anything must have encouraged or at least condoned" the misconduct).

Likewise, with respect to the Medej complaint, there is evidence that Charnicky made a conscious decision to look the other way. First, Charnicky asked Powell to look into the complaint but then appears to have made no inquiries into the investigation other than to accept Powell's representation either that the complaint was unfounded (Charnicky Dep. at 101) or that the matter had been taken care of by Powell (Medej/Powell Case File, at 2). Charnicky did not ask Powell to interview the officer from the Gurnee Police Department who participated in the stop, nor did he direct Powell to interview Medej. The "investigation" involved only taking the statement of the would-be target of the investigation, not his accuser, and Charnicky did not demand more. Charnicky did not comply with his obligation to send a written memorandum about the incident up the chain of command, as department policy required him to do. The only investigation into the matter occurred as a result of an anonymous complaint in 2004. Pl. SOAF ¶ 39. But Charnicky was faced with a potentially serious constitutional deprivation; the effect of not reporting the incident up the chain was to kill the investigation (until the anonymous complaint). The response, a jury could conclude, was "plainly inappropriate." *Hayes*, 546 F.3d at 524. In addition, a jury reasonably could infer that the lackluster investigation was intentional because of the lie with respect to the Brandenburg complaint and evidence that Charnicky told

Dozier what to say when the latter wrote up his version of his encounter with Brandenburg. See Fed. R. Evid. 404(b) (absence of mistake).

Finally, and for essentially the same reasons, a jury could find that Charnicky intentionally rubberstamped Meeder's initially-cursory investigation into allegations that Dozier spied on McSweeney's fiancée, Michelle Geller. Meeder discussed the matter with Dozier and talked to McSweeney by telephone initially. Even assuming that Meeder was telling the truth about McSweeney's desire to close the investigation, that would not absolve Charnicky of his knowledge of an allegation of misconduct against his subordinate. As Commander Haukedahl noted, the matter was serious and the initial investigation was not thorough. And, this must be reemphasized, the deliberate indifference inquiry focuses on what the supervisor knew. Summary judgment cannot be granted because here a jury reasonably could conclude that Charnicky knew that he had under his supervision an officer who had abused his police authority on two prior occasions (Brandenburg and Medej) and was spying on women (Geller). Even if the spying did not amount to a constitutional violation, and although the conduct cannot be said to have been an abuse of police authority as such, the conduct indicated a disregard for sexual privacy. In that regard, the *Andrews* case from the Eighth Circuit provides a useful guidepost. In *Andrews*, the court concluded that there was a genuine issue of material fact for the jury where supervisors had been aware of two prior complaints of misconduct. One complaint was an allegation that the subordinate was "prowling around inside" a woman's home. The other complaint was that the officer hinted, during a traffic stop, that a violation would be overlooked in exchange for sexual favors. 98 F.3d at 1075-76, 1078-79. When the officer subsequently committed a sexual assault, the court of appeals held that it was error for the district court to grant summary judgment on the plaintiff's supervisory liability claim in favor of the police chief.

Based on Meeder's abbreviated investigation (whose steps were documented and sent to Charnicky), Charnicky spoke with a sergeant at DII and agreed to close the case. Of course, the Seventh Circuit has emphasized that mere failure to follow reporting procedures does not amount to deliberate indifference. More than carelessness with regard to complaints must be presented to show that the supervisor approved of the conduct. *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993) (noting that if "failing to eliminate a practice" were "equated to approving it," then "every inept police chief in the country would be deemed to approve, and therefore become answerable to damages to all the victims of, the misconduct of the officers under his command"). But where a plaintiff can show that the steps taken were done in bad faith, the plaintiff may prevail in an action. *Id.* The critical evidence that Plaintiffs have marshaled raises a question as to whether Charnicky sought actively to stamp out investigations into Dozier. That evidence could be used to infer that the limited investigation was the result of design rather than ineptitude. And that inference might be particularly warranted here given that this was the third complaint that Charnicky had received about Dozier. *Baynard*, 268 F.3d at 236 (reasonable jury could conclude that supervisor's "failure to respond to mounting evidence of potential misconduct by [his subordinate] exhibited deliberate indifference").

In short, the record evidence before the Court could allow a jury to conclude that in those instances in which Dozier was accused of misconduct, Lieutenant Charnicky either worked actively to submarine the investigation or looked the other way. Particularly as the complaints against Dozier accumulated, Charnicky should have grown more curious, not less. Moreover, during the time period in question, Charnicky repeatedly gave high marks to Dozier.

Focusing specifically on the question of causation, there were three incidents of misconduct of which Charnicky was aware and to which he turned a blind eye. The incidents

occurred in 1999, 2003, and 2005. On these facts, a reasonable jury *could* conclude that Charnicky's conduct emboldened Dozier and thereby caused Plaintiffs' injuries, particularly given the high marks that Dozier received from Charnicky in his performance reviews. The character of the prior allegations were sufficiently similar, too: the Brandenburg complaint involved an officer abusing his police authority for personal aims, the Medej complaint involved a potentially serious constitutional violation while effecting a traffic stop, and the McSweeney complaint involved misconduct in the course of sexual gratification. Plaintiffs' encounter with Dozier combines the most salient features of the three prior incidents. Although a jury need not draw the inferences that would lead Plaintiffs to victory, and there is the risk in every tort case of reasoning that one thing is caused by that which preceded it,[21] the Court is not permitted to draw contrary inferences either. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts.").

## VI.    Qualified Immunity

Defendants argue that they are entitled to qualified immunity even if they committed a constitutional violation. The Court, considering only the immunity of Charnicky, respectfully disagrees. See *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (district court need not consider qualified immunity if it determines that no underlying constitutional violation occurred); see also generally *Pearson v. Callahan*, 129 S. Ct. 808 (2009) (making *Saucier*'s two-step sequence less rigid).

Qualified immunity "protects government officials from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Viilo v. Eyre*, 547 F.3d 707, 709 (7th Cir. 2008)

---

[21] The fallacy in reasoning is known as *post hoc ergo propter hoc*.

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is immunity from suit rather than merely a defense to liability. *Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007). The qualified immunity analysis comprises a two-part inquiry: (i) "whether the facts alleged show that the state actor violated a constitutional right," and (ii) "whether the right was clearly established." *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009). "[L]ucid and unambiguous dicta concerning the existence of a constitutional right can * * * make the right 'clearly established' for purposes of qualified immunity." *Hanes*, 578 F.3d at 496 (quoting *Wilkinson v. Russell*, 182 F.3d 89, 112 (2d Cir. 1999) (Calabresi, J., concurring)).

Although Defendants set out the qualified immunity framework, their arguments are unconvincing. They make two principal arguments. First, without citing case law, they apparently argue that because "Defendants were neither present during the incident involving Dozier nor had any knowledge of it until after Dozier's arrest approximately two months later" qualified immunity should apply. Def. Mem. at 17. The absence of case law would not have been a problem for Defendants—indeed it would have helped them—were there not so much of it. Defendants have not distinguished this case from myriad others considering the constitutional question at issue here, which opinions have appeared in Defendants' brief on the merits and in the body of this opinion. Those opinions unequivocally refute Defendants' legal position. In contrast, Plaintiffs, who bear the burden of defeating qualified immunity, correctly demonstrate that the legal principles at issue in this case are well established. There are numerous cases that have considered and indeed held that liability could be imposed on supervisors who were deliberately indifferent in the face of a subordinate's prior misconduct and therefore liable for subsequent constitutional torts. The argument that qualified immunity applies based on the absence of the supervisors from the scene of the misconduct and the supervisors' lack of

knowledge of the violation for which Plaintiffs seek recovery is not just insufficient; it ignores the existence of supervisory liability altogether. See, *e.g.*, *J.H. ex rel. Higgin*, 346 F.3d at 793; *Baynard*, 268 F.3d at 235-36; *Shaw*, 13 F.3d at 798; *Gibson*, 910 F.2d at 1515. Not all of the cases that are discussed in this opinion involved police officers, but they do use almost identical language about what must be proved to impose supervisory liability in Section 1983 cases. The cases do not require the supervisory officers to have been present nor do they require the supervisory officers to have committed the conduct personally—indeed that is what makes these cases supervisory liability cases rather than, for example, failure to intervene cases. Recent Seventh Circuit case law indicates that the standards for supervisory liability in this circuit have been established for more than twenty years, and the case law suggests that qualified immunity is less likely when a defendant helps to cover up misconduct. *T.E. v. Grindle*, --- F.3d ----, 2010 WL 938047, at *3, *4 (7th Cir. Mar. 17, 2010) (citing *Jones*, 856 F.2d 985). In sum, if supervisors were deliberately indifferent and caused their subordinate's misconduct, then they can be held liable under well delineated case law.

Defendants' second principal argument is that based on the prior complaints, no reasonable officer could have anticipated (*i.e.*, it was not foreseeable) that "Dozier would make Plaintiffs remove their clothing and run around a construction site naked." Def. Mot. at 18.[22] There are three major problems with those arguments. First, it is a caricature of the constitutional framework—no case has required the supervisory tortfeasor to have been able to divine the precise constitutional tort that ultimately occurred. See, *e.g.*, *Andrews*, 98 F.3d at 1075-76, 1078-79 (supervisory liability could attach for sexual assault where antecedent acts

---

[22] Defendants also argue that liability should not be imposed merely for following "the normal and accepted process of referring disciplinary complaints through the ISP chain of command and/or to DII" (Def. Mot. at 18), but there is too much evidence that reporting procedures were deliberately ignored for that argument to merit extensive discussion.

involved sexually suggestive hints during traffic stops and an incident of home-prowling); *Shaw*, 13 F.3d at 800 (supervisory liability could attach for an excessive force claim in which an officer fired multiple shots and killed a suspect, where antecedent acts involved "roughing up" individuals and being insulting to the public). The case law reveals that the pertinent question is whether the prior acts caused the subsequent constitutional tort and were similar enough to support a finding of deliberate indifference. See, *e.g.*, *J.H. ex rel. Higgin*, 346 F.3d at 794 (plaintiffs were required to show strong connection between conditions in foster homes and likelihood of committing child abuse). The second problem is that Defendants' general (and non-Defendant-specific) complaints about the relatedness of the prior complaints is presented in causal terms—Defendants argue about whether the alleged constitutional violation against Plaintiffs could have been "anticipated."[23] But causation is a fact question, and as discussed above, the legal framework which imposes liability for supervisors whose deliberate indifference causes a constitutional deprivation is well established. *Catlin v. City of Wheaton*, 574 F.3d 361, 368 (7th Cir. 2009) ("[W]hile the substantive constitutional standard protects officers' reasonable *factual* mistakes, qualified immunity protects them from liability where they reasonably misjudge the *legal* standard.") (emphasis added); *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2009) ("[Q]ualified immunity is a doctrine designed to respond to legal uncertainty but causation (a factual matter) had nothing to do with *legal* uncertainty."). The third problem for Defendants is that there is record evidence that Charnicky did not in fact follow the Illinois State Police's procedures for reporting complaints. With respect to Brandenburg, there was evidence that Charnicky tried to stamp out the investigation; with respect that the other cases, there is

---

[23] Indeed, to the extent that Dozier's infractions would not by themselves have presented a substantial risk of harm to a reasonable officer—a more nuanced argument that Defendants do not clearly articulate and which relates to the objective component of the deliberate indifference framework—a trier of fact rationally could conclude that the substantial risk of harm was created in part by Charnicky's willingness to thwart investigations and then issue positive performance evaluations to Dozier.

evidence that Charnicky failed to investigate misconduct and acted quickly in seeking to have investigations closed, despite the integral role that lieutenants are supposed to play in the disciplinary process and despite the seriousness of the allegations against Dozier.

In sum, Charnicky is not entitled to summary judgment based on qualified immunity. Qualified immunity is also called "good faith immunity" (*Andrews*, 811 F.2d at 370), and the record when viewed in the light most favorable to Plaintiffs indicates that good faith on the part of Charnicky was lacking. The evidence of misfeasance, willful nonfeasance, and ratification would allow a jury rationally to conclude that the Charnicky's conduct proximately caused Plaintiffs' constitutional deprivation. Qualified immunity is "a doctrine designed to protect public officials from the effects of guessing wrong in a world of legal uncertainty." *Cornejo*, 355 F.3d at 1023. Because there is no uncertainty about the legal issues that are at play in this case, Charnicky cannot prevail at summary judgment based on Defendants' assertion of qualified immunity. Rather, should the case go to trial, the extent of Charnicky's liability must turn on the jury's assessment of the facts and the credibility of the witnesses.

## VII.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment [93] is granted in part and denied in part. The motion is granted with respect to Powell and Meeder, and the motion is denied with respect to Charnicky.

Dated:  March 31, 2010

_____
Robert M. Dow, Jr.
United States District Judge